UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

vs.                                                           **Case No.:** 1:21-cr-00460-APM-1

**CALEB BERRY,**

 **Defendant.**

_____/

**SENTENCING MEMORANDUM
OF DEFENDANT CALEB BERRY**

DANIEL J. FERNANDEZ, ESQUIRE
625 E. Twiggs Street, Ste 102
Tampa, Florida 33602
Office: (813) 229-5353
Email: djfernandezlaw17@gmail.com
Fla. Bar No. 295371

Attorney for Defendant Berry

## **TABLE OF CONTENTS**

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       A.    Material Facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
       B.    The Plea Agreement and Guilty Plea. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   United States v. Booker and 18 U.S.C. Section 3553(a). . . . . . . . . . . . . . . . . . . . . . . . 4

IV.   The Application of 18 U.S.C. Section 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       A.    Factor One: The Nature and Circumstances of the Offense and the History and
              Characteristics of the Defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       B.    Factor Two: The Purposes of Sentencing. . . . . . . . . . . . . . . . . . . . . . . . . . . 11
       C.    Factor Three: the Kinds of Sentences Available. . . . . . . . . . . . . . . . . . . . . . . 12
       D.    Factors Four and Five: the Sentencing Guidelines and Guideline Policy
              Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             1.    Mr. Berry Should Receive a Downward Adjustment Under Guideline
                  Section 3B1.2(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
             2.    Mr. Berry Should Receive a Downward Variance.. . . . . . . . . . . . . . . . 15
             3.    In The Alternative, Mr. Berry Should Be Sentenced at the Low End of the
                  Applicable Range.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
       E.    Factor Six: The Need to Avoid Unwarranted Disparities. . . . . . . . . . . . . . . . . 17
       F.    Factor Seven: The Need to Provide Restitution.. . . . . . . . . . . . . . . . . . . . . . 17

V.    Forfeiture. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.   Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## **TABLE AUTHORITIES**

### Cases

*United States v. Abbadessa*, 848 F. Supp. 369 (E.D.N.Y. 1994)............................ 5

*United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). ........ 1, 4, 13

*United States v. DeRiggi*, 45 F.3d 713 (2d Cir. 1995)................................... 5

*United States v. Lacy*, 99 F. Supp.2d 118 (D. Mass. 2000)............................ 5, 11

### United States Code And Sentencing Guidelines

18 U.S.C. Section 3553........................................... 1, 4, 5, 11, 13, 17

### Other

ABA STANDARDS OF CRIMINAL JUSTICE § 18-2.4................................ 5

**I.     Introduction**

Defendant Caleb Berry submits this Memorandum with respect to a number of issues related to his sentencing. It is hoped that the Memorandum will be of assistance to the Court in light of the somewhat complex factual circumstances and the nature of the legal issues raised by the facts.

Three matters are addressed by this Memorandum. First, the material facts of the case are discussed.

Second, the Memorandum addresses the impact of the United States Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). *Booker* holds that the provision of the federal sentencing statute that makes the United States Sentencing Guidelines mandatory is unconstitutional. Id. at 125 S.Ct. 756. Pursuant to that opinion, the Court must consider each of the factors set forth in 18 U.S.C. Section 3553(a) in fashioning an appropriate sentence. Id. The Guidelines must be considered and taken into account under Section 3553(a), but the Court is not bound by the Guidelines sentence. Id at 125 S.Ct. 767.

Third, the Memorandum will discuss the application of the Section 3553(a) sentencing factors to this case. Section 3553(a) requires the Court to impose the lowest sentence that will satisfy the purposes of sentencing set forth in that statute. Because the Court will be required to consult the Guidelines and the Sentencing Commission's policy statements and take them into account in sentencing Mr. Berry under Section 3553(a), issues related to the guidelines applicable to this case will be addressed within the section discussing the application of Section 3553(a).

## II.     Background

### A.     Material Facts

Mr. Berry has entered a plea of guilty to Count 1, Conspiracy in violation of 18 USC §

371; and Count 2, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of

18 USC §§ 1512(c)(2) and 2.

### B.     The Plea Agreement and Guilty Plea

Mr. Berry entered into a plea agreement with the government and agreed to plead guilty

to Counts One and Two of the indictment and to cooperate with the government. He agreed that a

conviction for 18 USC § 371 carries a statutory maximum penalty of five years of imprisonment.

He acknowledged that a conviction for 18 USC § 1512(c)(2) carries a statutory maximum

sentence 20 years of imprisonment.

In the plea agreement, the parties agreed to the following guideline computations: the

base offense level is 14, USSG §2J1.2; eight levels are added for causing/threatening injury or

damage, USSG §2J1.2(b)(1)(B); three levels are added because there was substantial interference

with justice, USSG §2J1.2(b)(2); two levels are added because the offense involved extensive

scope, planning, or preparation, USSG §2J1.2(b)(3)(C), two levels are added for

obstruction (destroying documents), USSG §3C1.1, and a two-level downward adjustment

is appropriate for minor role, USSG §3B1.2, for an adjusted offense level of 27. The plea

agreement indicates that the government will recommend a three-level reduction for acceptance

of responsibility, therefore, the estimated offense level will be at least 24.

As required by his plea agreement, Mr. Berry has cooperated with law enforcement and

the government. The nature and extent of Mr. Berry's cooperation will be discussed in more

2

detail at the sentencing hearing in this case.

**Offense Level Computation (2023 US Sentencing Guidelines)**

**Count One:** Conspiracy, 18 USC § 371

**Count Two:** Obstruction of an Official Proceeding and Aiding and Abetting, 18 USC §§ 1512(c)(2) and 2.

The guideline applicable to Count One is USSG §2X1.1. The guideline applicable to Count Two is USSG §2J1.2.

Counts One and Two are grouped together pursuant to USSG §3D1.2(b), because one Count charges a conspiracy and the other Count charges a substantive offense that was the sole object of the conspiracy. The applicable guideline is USSG §2J1.2. Count Group 1: Obstruction of an Official Proceeding and Aiding and Abetting, 18 USC § 1512(c)(2).

**Base Offense Level:** The guideline for 18 USC § 1512 offenses is found in USSG §2J1.2 of the guidelines and the base offense level is 14. USSG §2J1.2(a).                    14

**Specific Offense Characteristics:** The offense was otherwise extensive in scope, planning, and preparation, therefore, two levels are added. USSG §2J1.2(b)(3).                    2

**Adjustment for Obstruction of Justice:** The defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense, therefore, two levels are added. USSG §3C1.1    2

**Adjusted Offense Level (Subtotal):**                    **18**

**Acceptance of Responsibility:** The defendant has clearly demonstrated acceptance of responsibility for the offense. Accordingly, the offense level is decreased by two levels. USSG §3E1.1(a).                    -2

**Acceptance of Responsibility:** The defendant has assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty. Accordingly, the offense level is decreased by one additional level. USSG §3E1.1(b).                                                                                        -1

**Total Offense Level:**                                                                              **15**

**III.     United States v. Booker and 18 U.S.C. Section 3553(a)**

The decision of the United States Supreme Court in *Booker* has rendered the Sentencing Guidelines "effectively advisory." Id. at 767. Pursuant to *Booker*, sentencing courts are required to consider a defendant's Guideline range, but may "tailor the sentence in light of other statutory concerns as well." Id (citing 18 U.S.C. § 3553(a)).

The effect of *Booker* is that federal district courts must consider the seven factors set forth by Section 3553(a) in determining a sentence:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed—
   (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   (B)     to afford adequate deterrence to criminal conduct;
   (C)     to protect the public from further crimes of the defendant; and
   (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     [the applicable Sentencing Guidelines];

(5)     any pertinent [Sentencing Guidelines] policy statement

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

Each of these factors will be discussed in turn below.

Section 3553(a) embodies the "parsimony principle," which, requires a district court to

4

"assign a sentence 'sufficient, but not greater than necessary to comply with the purposes' of sentencing" set forth in Section 3553(a)(2). *United States v. Lacy*, 99 F. Supp.2d 118, 119 (D. Mass. 2000) (quoting § 3553(a)); see also *United States v. Abbadessa*, 848 F. Supp. 369, 378 (E.D.N.Y. 1994) ("parsimony" is a "key provision" of Section 3553(a)), vacated on other grounds, *United States v. DeRiggi*, 45 F.3d 713 (2d Cir. 1995); see generally ABA STANDARDS OF CRIMINAL JUSTICE § 18-2.4 (sentences "imposed, taking into account the gravity of the offense, should be no more than necessary to achieve the social purposes for which they are authorized"). Sentencing under Section 3553(a) therefore requires the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as is necessary to comply with Section 3553(a)'s purposes.

## IV.   The Application of 18 U.S.C. Section 3553(a)

### A.   Factor One: The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

Caleb Berry was born on May 9, 2001, in Tampa, Florida. He does not know his father. Mr. Berry's mother is 38 years old and resides in Tampa, Florida. Mr. Berry's mother and biological father were 15 and 16, respectively, at the time of his birth. His mother dropped out of high school to care for him. His mother and father married for a brief period of time and resided with Mr. Berry's maternal grandparents. They divorced in 2003. Shortly thereafter, she began a relationship with Mr. Berry's stepfather, Timothy Kemner, who he refers to as his father.

While Mr. Berry was very young, his mother became addicted to pain medication. When he was six years old, she almost overdosed at a local grocery store while he was with her, and he watched as they took her away in an ambulance. His stepfather picked him up from the store. Timothy Kemner and Berry's mother lost custody of Caleb Berry and his sister when both the

mother and stepfather went into a drug treatment program.

Mr. Berry has close family ties with his mother and stepfather, who have continued to provide emotional and financial support. Mr. Berry is single and does not have any children. The defendant is a lifelong resident of Florida.

Mr. Berry joined the Florida chapter of the Oath Keepers in 2020. At the time, he was caught up in the political drama and was lonely, so he joined because he wanted to belong to something. He had always wanted to do military stuff but did not join the military and thought of the Oath Keepers as a secondary route. He saw that the Oath Keepers were protecting individual's property during various riots, and he began researching the organization because he wanted to help.

Kelly Meggs was the leader of the Florida chapter of the Oath Keepers in 2020. Mr. Berry did not know Mr. Meggs or any other members of the Oath Keepers prior to joining. Following the instant offense, Mr. Berry stopped all communication with organization members.

Mr. Berry has been in counseling since the age of six, when he was temporarily removed from his mother's care. After being returned to her custody, he and his mother attended regular counseling sessions for a total of four or five years. He was diagnosed with anxiety and depression at the age of 14 or 15 and was placed on medication by his pediatrician. Mr. Berry was bullied while in middle and high school and had contemplated suicide by overdosing during that time. Mr. Berry also suffers from nightmares once or twice weekly. He is currently prescribed medications by his psychiatrist, Dr. Cuong Ton, in Tampa, Florida.

Mr. Berry graduated from Hillsborough High School in Tampa, Florida in 2019. He attended a four-day training course in Tampa, Florida and was licensed as an unarmed

security guard in 2021 or 2022. He also received a Manager Food Safety certification through ServSafe while he was in high school.

Mr. Berry has never served in the US Armed Forces. He registered with the Selective Service System on April 9, 2019. He was employed at the time of his arrest. Since May 26, 2022, the defendant has been employed in the parts warehouse of RDK Truck Sales in Tampa, Florida. He is a full-time employee and earns $18 hourly.

### Forensic Psychological Evaluation

On August 26 and 31 of 2021, and January 15, 2022, Mr. Berry was evaluated by Randy K. Otto, Ph.D., Licensed Psychologist, Board Certified in Clinical Psychology, Board Certified in Forensic Psychology, American Board of Professional Psychology. During the evaluation, Mr. Otto made several observations:

"Mr. Berry cried during the second of our three sessions, including when he discussed the events that precipitated his arrest and the implications that his arrest had on his longstanding goals of entering the military and/or working in law enforcement." See Otto Evaluation, p. 3, Appendix, Tab 1.

"Mr. Berry . . . described his travel to Washington as motivated by his misguided desire to support President Trump and protest what he considered at the time to be the "rigged" 2019 election . . . Mr. Berry explained that he did not assault or threaten anyone while at the Capitol, and he was very disturbed by threats towards and assaults of law enforcement officers he witnessed. He stated that he returned to his hotel later that day feeling disillusioned with what had happened, and he expressed his concern and upset in a phone call to his mother later that night . . . Mr. Berry indicted that, after returning to Florida, he began to distance himself from the

7

Oathkeepers, and he eventually resigned as a result of feeling 'used and betrayed.'" See Otto
Evaluation, p. 10, Appendix, Tab 1.

"Ms. Kemner [Berry's Mother] described her son as patriotic and an advocate for the
military and law enforcement since his childhood . . . Mr. Kemner [Berry's stepfather] offered his
perspective that the examinee's affiliation with the Oathkeepers provided him with some feeling
of social acceptance, while his involvement with them around their supposed security functions
satisfied some of his interests in the military and law enforcement." See Otto Evaluation, p. 11,
Appendix, Tab 1.

"His participation in the events of January 6th is the result of a combination of factors
including his failure to take advantage of his potential and desire to see himself as doing
something meaningful with his life; his misguided belief that his involvement with the
Oathkeepers . . . would provide him an opportunity to achieve and do important things; his
naivete; his unmet needs for affiliation; and his longstanding interest in law enforcement and the
military . . . Mr. Berry became concerned about social unrest that was occurring around the
United States in 2019, and developed the misguided belief that such unrest represented a risk to
the general welfare of the country generally, and the Tampa Bay area, specifically. When looking
for ways he could response, Mr. Berry made contact with the Oathkeepers, which he understood
to be a group largely consisting of people who worked or had worked in two professions to
which he aspired-the military and law enforcement. Mr. Berry came to believe that members of
this group were willing to 'defend people and property' in this country from those who harbored
ill intentions, and he became involved with them as a result. Being a member of this group
served a number of functions for Mr. Berry. It met Mr. Berry's unmet needs for affiliation, which

8

resulted from his failure to have developed a group of friends or others with whom he identified, and it allowed him to (naively) believe he was doing something of importance and serving a greater purpose. Examples of Mr. Berry's naivete around these matters are his report that he served an important function by identifying for the Oathkeepers 'critical infrastructure' that was vulnerable to attack, his excitement about working with other Oathkeepers to provide 'security' for Roger Stone when he spoke at a St. Petersburg bar, and his belief that he and other Oathkeepers were traveling to the nation's capital in order to provide security for members of congress who were scheduled to address the public. Affiliating with the Oathkeepers and providing security at events also [met] Mr. Berry's needs for affiliation and gave him some feeling of purpose and achievement around matters that were important to him. Once he saw the outcome of the events in which he participated, reflected on what he had done, and learned more about the Oathkeepers, Mr. Berry realized the error of his ways. He has subsequently made a number of efforts to remedy and take responsibility for the mistakes he has made, and he continues to do so." See Otto Evaluation, pp. 12-13, Appendix, Tab 1.

Since December 5, 2022, Caleb has been under the care and treatment of Dr. Cuong Ton. The diagnosis is categorized in the diagnostic and statistical manual of mental disorders, 5th ed. The treatment plan has included a combination of psychotherapy and pharmacotherapy, with regular monitoring and adjustments based on the patient's progress and symptomology.

Over the course of treatment, Caleb has demonstrated substantial emotional and psychological growth. He has developed greater emotional resilience, improved coping mechanisms, and a deeper understanding of his mental health. This progress has positively impacted his daily challenges and has enhanced his overall quality of life.

As of the most recent evaluation, Caleb continues to make steady progress. He remains committed to his treatment plan and is actively engaged in therapy. His symptoms are well-managed, and he exhibits a strong capacity for self reflection and emotional regulation.

Caleb Berry has shown commendable progress in his treatment for PSTD, MDD, GAD, and panic disorder. His journey reflects a strong commitment to his mental health and personal growth. See Ton Evaluation, pp. 1-2, Appendix, Tab 2.

### Letter of Apology

After the events on January 6th, Mr. Berry wrote a letter of apology which was forwarded to four of the officers that were injured during January 6th. In this letter Mr. Berry indicated that, although he joined the Oathkeepers because he initially considered them to be a positive, pro-law enforcement organization made up of law enforcement officers and military veterans, he came to learn that he was misguided in these beliefs. In his letter, Mr. Berry apologized for his actions and wrote that he was sorry for and ashamed of his involvement in the events of January 6th and terrified by the events he witnessed, and regretted his involvement with the Oathkeepers-from which he had immediately resigned after returning to Florida. See Mr. Berry's Letter of Apology, Appendix, Tab 3.

### Letters of Reference

Numerous concerned family members, friends, co-workers and concerned citizens have submitted character reference letters on behalf of Caleb Berry. It is hoped that the reference letters will be of assistance to the Court in light of the somewhat complex factual circumstances and the nature of the legal issues raised by the facts.

The reference letters indicate that Berry is a family oriented person, with a history of love

for his country and a strong sense of patriotism. The reference letters strongly suggest that Berry was mislead, that he has shown remorse and accepts responsibility for his actions, clearly indicating that he is deserving of leniency. See Reference Letters, Appendix, Tab 4.

**B.      Factor Two: The Purposes of Sentencing**

Section 3553(a)(2) lists four purposes of sentencing, which can be summed up as: (1) just punishment; (2) deterrence; (3) protection of the public; and (4) rehabilitation. Under the parsimony principle, the sentence in this case should be the minimum necessary to accomplish the listed purposes. See § 3553(a); *Lacy*, 99 F. Supp. 2d at 119.

With regard to a just punishment in this case, prior to January 2020, Mr. Berry had no contact with the criminal justice system. His participation in the events of January 6th was the result of, among other things, his misguided desire to support President Trump and protest what he considered at the time to be the "rigged" 2019 election, and Mr. Berry's misguided belief that his involvement with the Oathkeepers would provide him an opportunity to achieve that desire, and satisfy his need for affiliation and his longstanding interest in law enforcement and the military. Mr. Berry was 18-years-old on January 6, 2020. Mr. Berry's immaturity and the fact that his degree of involvement was a result of, and at the direction of, the Oathkeepers, weighs in favor of leniency. Moreover, Mr. Berry did not assault or threaten anyone while at the Capitol, and he was very disturbed by threats towards and assaults of law enforcement officers he witnessed. After returning to Florida, Mr. Berry resigned from the Oathkeepers as a result of his feelings that he was used and betrayed.

With regard to deterrence, Mr. Berry's pain and the fall from grace associated with his arrest and conviction, and the implications that his arrest and conviction will have on his

11

longstanding goals of entering the military or working in law enforcement, should serve as a deterrence to Mr. Berry and others.

As to protecting the public and rehabilitation, but for Mr. Berry's misguided desire to support President Trump, and his misguided belief that his involvement with the Oathkeepers would provide him an opportunity to achieve that desire, coupled with Mr. Berry's immaturity and the fact that Mr. Berry's degree of involvement was a result of, and at the direction of, the Oathkeepers, Mr. Berry would not have participated in this offense. Mr. Berry has no prior convictions and was used and betrayed by the Oathkeepers into participating in this offense, which suggest that he is not a danger to re-offend, or in need of rehabilitation. Moreover, Mr. Berry pleaded guilty shortly after he was indicted, agreed to cooperate with the government, and has done so.  Mr. Berry's cooperation and acceptance of responsibility for his conduct suggest that he is not a danger to the public or likely to re-offend.

**C.      Factor Three: the Kinds of Sentences Available**

Mr. Berry pled guilty to Counts One and Two of the Information pursuant to a plea agreement. A conviction for 18 USC § 371 carries a statutory maximum penalty of five years of imprisonment. A conviction for 18 USC § 1512(c)(2) carries a statutory maximum sentence of 20 years of imprisonment. Based upon a total offense level of 15 and a criminal history category of I, the guideline imprisonment range is 18 months to 24 months.  Both parties have reserved the right to seek a variance outside of the applicable guidelines range based on the factors to be considered in 18 USC § 3553(a). As a result of the presentence investigation, the Probation Office has identified the following factor that may warrant a variance from the applicable guideline range: the defendant's age at the time of the offense and the need to avoid

12

unwarranted sentence disparity among similarly situated defendants.

**D.** **Factors Four and Five: the Sentencing Guidelines and Guideline Policy Statements**

Pursuant to *Booker*, district courts, while not bound to apply the Guidelines, must consult

those Guidelines and take them into account when sentencing.

**1.** **Mr. Berry Should Receive a Downward Adjustment Under Guideline Section 3B1.2(b).**

Section 3553(a)(5)(A) requires the Court to consider "any pertinent policy statement . . .

issued by the Sentencing Commission." Section 3B1.2(b), (Mitigating Role), states in pertinent

part:

> Based on the defendant's role in the offense, decrease the offense level as follows:
> . . .
> (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
> . . .
> Commentary
> Application Notes:
> . . .
> 3. Applicability of Adjustment.—
> (A) Substantially Less Culpable than Average Participant.—This section provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity. A defendant who is accountable under §1B1.3 (Relevant Conduct) only for the conduct in which the defendant personally was involved and who performs a limited function in the criminal activity may receive an adjustment under this guideline. For example, *a defendant who is convicted of a drug trafficking offense, whose participation in that offense was limited to transporting or storing drugs and who is accountable under §1B1.3 only for the quantity of drugs the defendant personally transported or stored may receive an adjustment under this guideline.*

USSG §3B1.2(b), Mitigation Role (Emphasis added).

Mr. Berry contends that under the Guidelines, he should received a downward adjustment of two levels in his offense level pursuant to U.S.S.G. Section 3B1.2(b) because he had only a minor role in the offense in this case.

Mr. Berry respectfully requests a two-level adjustment to reflect his minor role in the offense and to reflect the written plea agreement for such a reduction between Mr. Berry and the government. Mr. Berry was an 18 year old who joined the "Oath Keepers" in November of 2020 in an attempt to "belong to something" and find social acceptance. In the two months after joining, Mr. Berry aided and abetted others in their attempt to obstruct an official proceeding on January 6, 2021. Mr. Berry submits that his role was significantly less culpable than most other participants.

In accordance with USSG §3B1.2(b), the Court must use a fact-based determination when considering the application for a minor role. U.S.S.G. § 3B1.2, comment. (n.3(C)). Some of the factors that the Court should consider are:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii) The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv) the nature and extent of the defendants participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> (v) the degree to which the defendant stood to benefit from the criminal activity.

Mr. Berry was not aware of the full scope and structure of the Oath Keepers and what their overall plans were. He had limited participation in any planning or organizing of the events on January 6, 2021, and basically did what he was told by other higher ranking members of the

group. Further, Mr. Berry did not have any decision making authority in the case. Therefore, Mr.

Berry submits that the Court should honor the two-level downward adjustment set forth in the

plea agreement as his conduct in the case supports such a reduction.

### 2.    Mr. Berry Should Receive a Downward Variance.

Mr. Berry is a 22 year old before the Court for his participation in the January 6, 2021,

events. Mr. Berry endured an unstable childhood beginning at an early age. His parents were

teenagers when he was born and ill-prepared to care for him. His biological father neglected him

and his mother, and ultimately left the marriage. Both parents remarried, and Mr. Berry was the

victim of sexual abuse around the age of four from his new stepmother. His biological father was

sentenced to prison, resulting in Mr. Berry not having contact with him until he was

approximately 11 years old.

Mr. Berry began mental health counseling at the age of six when he was temporarily

removed from his mother's care. He continued regular counseling for approximately four or five

more years. He was diagnosed with anxiety and depression, at the age of 14 and placed on

medication by his pediatrician. He recalls being bullied in middle and high school and

contemplated suicide. Currently, Mr. Berry suffers from weekly nightmares and is currently

prescribed multiple medications.

Mr. Berry underwent a mental health evaluation by Randy K. Otto, Ph.D, ABPP. Dr. Otto

interviewed Mr. Berry on three separate occasions, and administered several personality tests and

cognitive assessments. Dr. Otto's diagnostic impression of Mr. Berry is that he suffers from

Dysthmic Disorder, Panic Disorder and possible cannabis use disorder.

Mr. Berry has longed for a career in the military or law-enforcement from a young age.

When he joined the Oath Keepers, he felt a sense of belonging and somewhat of a fulfillment of this desire. It was his understanding that he was to "provide security" for other Oath Keepers on January 6, 2021. He stated that he felt disillusioned after the event, and felt "used and betrayed."

Mr. Berry regretted his participation in the events and wrote a letter of apology to a number of the U.S. Capital police. In the letter he apologized for his actions and indicated that he was ashamed of his involvement in the events and that he was terrified by the events that he witnessed. Mr. Berry has fully cooperated with law enforcement, and continues to do so by testifying in front of the Grand Jury and at the trials of members of the Oath Keepers.

Since his release on July 20, 2021, Mr. Berry has complied with all of the terms and conditions of his release. He has maintained lawful employment and he has always held a job even as a teenager in high school. Mr. Berry has no criminal history and has never been arrested. Up until this unfortunate incident, he has been a lawful and productive citizen.

Mr. Berry's childhood has negatively impacted his life and continues to do so on a daily basis with feelings of anxiety, depression, loneliness and sleeping difficulties. He joined the Oath Keepers with the hopes of belonging to an organization where he could satisfy his desire to exercise his patriotism and love for his country. However, his youthfulness and naivety impaired his judgment, and it was too late before he realized he had made a very poor choice. However, after January 6, he distanced himself from the organization and has made it his mission to amend for his conduct.

Under USSG §5H1.1, the guidelines state that, "age (including youth), may be relevant in determining whether a departure is warranted, if considerations based on age, individually, or in combination with other offender characteristics, are present to an unusual degree, and distinguish

the case from the typical cases covered by the guidelines." Mr. Berry's age at the time of the

offense, combined with his personal history and family characteristics contributed to his

involvement in the offense. This is also evidenced by Mr. Berry's lack of prior or subsequent

criminal history.

Considering the factors set for under 18 U.S.C. §3553, including the nature and

circumstances of the offense, the history and characteristics of the defendant and the need to

protect the community from future crimes by the defendant, Mr. Berry submits that a

non-incarcerative sentence is applicable in this case. Mr. Berry has maintained a stable residence,

lawful employment, and has complied with the terms and conditions of his release for almost 2 ½

years. He is not a threat to his community and will comply with any conditions that the Court

imposes.

### 3. In The Alternative, Mr. Berry Should Be Sentenced at the Low End of the Applicable Range.

A sentence at the low end of the applicable range would fully satisfy the need to punish

Mr. Berry. He acknowledged his involvement in the offense, accepted responsibility for his

conduct, and cooperated with law enforcement.  The Court should therefore determine the

appropriate Guidelines sentence to be the low end of the range the court holds to be applicable in

this case.

### E. Factor Six: The Need to Avoid Unwarranted Disparities

The sixth Section 3553(a) factor requires the Court to consider the need to avoid

unwarranted disparities among defendants with similar records who have been found guilty of

similar conduct. Disparity is not applicable in this case.

### F. Factor Seven: The Need to Provide Restitution

17

The provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense. Per the plea agreement, Mr. Berry agreed to pay restitution in the amount of $2,000.

## V.    Forfeiture

Mr. Berry agreed in his plea agreement to forfeiture.

## VI.    Conclusion

For the above reasons, Mr. Berry submits that a non-incarcerative sentence is applicable in this case.

Respectfully submitted,


/s/ Daniel J. Fernandez
DANIEL J. FERNANDEZ, Esquire
625 E. Twiggs Street, Ste 102
Tampa, Florida 33602
Office: (813) 229-5353
Email: djfernandezlaw17@gmail.com
Fla. Bar No. 295371
Attorney for Defendant Berry

18

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on _____, 2024, I electronically filed the

foregoing with the Clerk of Court by using the CM/ECF system which will send notice of

electronic filing to counsel of record.

_____

DANIEL J. FERNANDEZ, Esquire

19

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**UNITED STATES OF AMERICA,**

**vs.**                                                   **Case No.:** 1:21-cr-00460-APM-1

**CALEB BERRY,**

      **Defendant.**

_____/

**APPENDIX**

DANIEL J. FERNANDEZ, ESQUIRE
625 E. Twiggs Street, Ste 102
Tampa, Florida 33602
Office: (813) 229-5353
Email: djfernandezlaw17@gmail.com
Fla. Bar No. 295371

Attorney for Defendant Berry

## **INDEX TO APPENDIX**

**Description**                                                                 **Tab No.**

Otto Evaluation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 1

Ton Evaluation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 2

Berry's Letter of Apology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 3

Reference Letters. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Tab 4

# Tab 1
# (Otto Evaluation)

# RANDY K. OTTO, PhD, ABPP

### LICENSED PSYCHOLOGIST
### CLINICAL PSYCHOLOGY & FORENSIC PSYCHOLOGY

13701 BRUCE B. DOWNS BLVD, SUITE 111
TAMPA, FLORIDA 33613

OFFICE: (813)-977-2924
FAX: (813)-977-2925

## FORENSIC PSYCHOLOGICAL EVALUATION

NAME: Caleb Berry
DATE OF BIRTH: 5/9/01
AGE: 20
EDUCATION: High School Diploma
MARITAL STATUS: Single

DATES OF EVALUATION: 8/26/21, 8/31/21, 1/15/22
DATE OF REPORT: 2/24/22

### IDENTIFYING INFORMATION, REFERRAL QUESTION, & NOTIFICATION

Caleb Berry was referred for evaluation by his attorney, Daniel Fernandez, who provided documents indicating that Mr. Berry pleaded guilty to charges of conspiracy and obstruction of congress based on his participation in the events that occurred on January 6, 2020 at the US Capitol Building.  Mr. Fernandez further reported that his client had expressed to him his remorse about what had occurred, written a letter of apology to US Capitol police officers who were serving that day, cooperated with and answered the questions of federal agents who were investigating the events in question during the course of multiple meetings, testified in front of a federal grand jury, and anticipated testifying at upcoming trials.

Mr. Fernandez requested that I conduct a psychological evaluation of Mr. Berry focused on his background and psychological functioning as it might go towards better understanding his participation in the events of January 6th.  I met with evaluated Mr. Berry in my North Tampa office over the course of three sessions.

At the beginning of our first meeting, I introduced myself and explained to Mr. Berry the nature and purpose of the evaluation, how I was involved, how the evaluation results might be used, and the conditions under which I might write a report or testify.  I then provided Mr. Berry with a written form documenting this same information which he read, indicated his understanding of, and signed.

1

Berry Evaluation

## SOURCES OF INFORMATION

I considered information from the following sources when conducting this evaluation:

- Clinical interviews with Caleb Berry (8/26/21, 1.5 hours; 8/31/21, 1.0 hours)
- Personality Assessment Inventory (8/31/21)
- NEO Personality Inventory-3 (8/31/21)
- Beck Depression Inventory-II (8/26/21, 1/15/22)
- Montreal Cognitive Assessment (8/31/21)
- Videoconferencing interview with Erica Kemner, the examinee's mother (9/22/21, .8 hours)
- Videoconferencing interview with Tim Kemner, the examinee's stepfather (9/22/21, .3 hours)
- E-mail communication from Erica Kemner (9/22/21)
- Letter authored by Assistant US Attorney Jeffrey Nestler detailing conditions of Mr. Berry's plea agreement
- Mr. Berry's Statement of Offense
- Mr. Berry's Letter of Apology

## BEHAVIORAL OBSERVATIONS & TEST RESULTS

Caleb Berry is a 20-year-old, White male who appears his stated age.  Each time we met he was casually but appropriately dressed, and wore a mask for hygienic purposes.  Mr. Berry was alert and oriented during all three of our meetings, but consistently appeared to lack energy.  He correctly identified himself, his date of birth and age; his address; the day of the week, date, month, and year; and the city and state during our first and third sessions.  His performance on the Montreal Cognitive Assessment during our second session reflected no gross impairments with respect to his memory, attention, receptive language, expressive language, or decision making.

For much of our first meeting, Mr. Berry's right leg shook quickly, reflecting some level of anxiety or discomfort, which eventually subsided.  Mr. Berry was pleasant during all of our time together and complied with all requests made of him.  He volunteered information appropriately, and was very deliberate and thoughtful when answering questions.  His responses to questions were consistently relevant and informative, and he was able to distinguish relevant from irrelevant information.  Mr. Berry's speech was well-paced and goal-directed during all of our contacts, and there were no indications that the logic or form of his thinking was impaired by mental disorder.  Similarly, Mr. Berry did not share or report any

2

Berry Evaluation

history of unusual ideas reflecting impaired thought content flowing from mental disorder (i.e., there were no evidence of paranoid, grandiose, or other delusional thinking in the past or present). Finally, Mr. Berry reported never experiencing other symptoms of mental disorder such as auditory or visual hallucinations (i.e., hearing or seeing things not there).

During all meetings, Mr. Berry's attention and concentration appeared unimpaired, as did his memory for remote and recent events. He displayed a limited range of emotion and appeared depressed during all of our contacts as evidenced by his lack of eye contact and somber mood. Mr. Berry cried during the second of our three sessions, including when he discussed the events that precipitated his arrest and the implications that his arrest had on his longstanding goals of entering the military and/or working in law enforcement.

During all of our meetings Mr. Berry described himself as depressed and anxious, which he partially attributed to his involvement in the events of January 6th, his resulting legal involvement, and the implications this had fir his future. He noted, however, that he had a history of depression and anxiety that predated these events. Symptoms of depression and anxiety Mr. Berry reported experiencing included dysphoria (feeling sad), sleep difficulties, diminished sex drive, nightmares, lethargy, anhedonia (i.e., not feeling good about things), diminished motivation, feelings of guilt and regret, and ruminative thinking. He indicated, however, that he had no plans or intent to hurt himself.

Mr. Berry's responses to the Beck Depression Inventory-II, a face-valid self-report measure of depression that I administered in both August 2021 and January 2022, portrayed him as experiencing a moderate level of depression characterized by symptoms that included dysphoria (feelings of sadness); feelings of pessimism, guilt, failure, and disappointment in himself; difficulty experiencing pleasure and enjoyment; increased irritability and agitation; and diminished appetite, energy, and sex drive.

At the time of our August 2021 meetings, Mr. Berry indicated he was taking a minimal dose of an anti-depressant medication that had recently been prescribed by his primary care provider. When we met in January of 2022, however, he informed me he had discontinued this medication because he did not consider it to have any positive effect on his mood.

On August 26th I administered to Mr. Berry the Personality Assessment Inventory (PAI), a structured, self-report measure of emotional and behavioral functioning. Response style scales of the PAI indicate that Mr. Berry responded to the items in a consistent manner and neither

3

Berry Evaluation

attempted to exaggerate nor minimize problems he was experiencing at the time of testing. Thus, the interpretation offered below should be a good reflection of his current functioning and adjustment.

The PAI profile produced by Mr. Berry portrays him as experiencing a number of symptoms that are likely to affect his day-to-day functioning. Consistent with results of the BDI-II (see above), the PAI profile indicates that Mr. Berry was experiencing significant symptoms of depression and anxiety at the time of testing that are likely to include dysphoria (feelings of sadness), lethargy, sleep difficulties, ruminative thinking, and increased physiological arousal. The experience of some of these symptoms may, in part, result from a prior traumatic life event (which Mr. Berry identified as being the victim of a drive-by shooting). Difficulty in relationships is also reflected by Mr. Berry's PAI profile. Mr. Berry is likely to feel he has been betrayed by others on whom he has relied in his past, and be guarded in his relationships and find it difficult to trust others as a result.

Mr. Berry's PAI profile suggests no problems with increased irritability, excessive energy, thrill- or sensation-seeking behaviors, grandiose thinking, anti-social attitudes or behaviors, or aggressive attitudes or behaviors. Although the PAI profile raised the possibility of self-injurious behavior, Mr. Berry explicitly denied any such thoughts of such at the hygienic of the evaluation or in the past.

I also administered to Mr. Berry the NEO Personality Inventory-3 (NEO PI-3), a structured, self-report measure of personality. The NEO-PI-3 portrays Mr. Berry as experiencing a normal amount of psychological distress and able to manage stressors reasonably well. The NEO-PI-3 portrayed Mr. Berry as average with respect to his level of extraversion which reflects that, while he enjoys spending time with other people, he also has periods when he prefers to be alone. The NEO-PI-3 profile reflects that Mr. Berry values both new and familiar experiences, is as good natured and willing to cooperate with others as the average person, has a typical level of need for achievement, is reliable, and has an average amount of self-discipline.

4

Berry Evaluation

**RELEVANT HISTORY**

*Unless otherwise indicated, all information in this section was provided by the examinee, his mother, or stepfather.*

*Developmental & Medical Histories*

I interviewed with examinee's mother, Erica Kemner, via videoconferencing technology. Ms. Kemner reported that she received prenatal care and used no alcohol, drugs, or tobacco when pregnant with her son. Ms. Kemner stated that her son was the product of a 9-month, uncomplicated pregnancy and was delivered via Cesarean section when she was 15 years old. She described her the examinee as achieving most developmental milestones (e.g., crawling, walking, talking, toilet training) as expected or early, and he experienced no significant injuries or illnesses during his infancy and childhood with the exception of when he experienced a mild concussion when enrolled in pre-kindergarten.

Mr. Berry described his health as "decent" and reported no history of chronic illnesses, major injuries, or significant surgeries/hospitalizations. He commented that he was "skinny" and unable to gain weight, and complained of a diminished appetite and associated weight loss, which he attributed to distress he experienced resulting from his 2020 arrest and his current involvement in the legal system.

*Family History*

Mr. Berry reported he was born and raised in Tampa. He stated he grew up alongside his four half-siblings (current ages 16, 14, 14, and 13) and was primarily raised by his mother and stepfather. Mr. Berry reported having no memory for ever living with his father as a result of his parents separating when he was very young and his stepfather coming into his life when he was a toddler.

Mr. Berry described his mother as an "amazing woman, wife, and mother" who was sometimes demanding and had difficulty understanding of his problems with depression and anxiety. Mr. Berry stated that, in the past, his mother's struggles with substance abuse resulted in him and his half siblings having some contact with child protective services and being placed in the custody of family members for a period of time. He noted, however, that his mother had abstained from substances for the preceding 13 years and was a much better parent as a result.

5

Berry Evaluation

Mr. Berry reported having a much closer relationship with his stepfather than with his biological father, and never feeling like a stepchild.  He noted, however, however that his stepfather also had a history of substance abuse, which was partly responsible for his family's contact with child protective services.

Mr. Berry described his relationship with his father as "complicated" and reported he had no real bond with him.  He described his father as neglecting him during his childhood and often going for long periods of time without making an effort to contact him.  He further indicated that, when he did have contact with his father and his father's new family, things did not go well.  As a result of these continued difficulties, reported Mr. Berry, he cut off all contact with his father at the age of 12 and, when he reached out to him when 19, his father made no real effort to reengage with him.

*Social History*

Mr. Berry stated, "I don't have many friends" and explained that he did not keep in much contact with those friends that he did have.  Mr. Berry described himself as being bullied in high school but eventually finding a group of peers with whom he interacted and was comfortable.  When asked to identify on whom he relied for support Mr. Berry described himself as very close to his mother and stepfather.

Ms. Kemner described her son as having no difficulty making friends and interacting with peers when younger, but noted that he was bullied during his high school years.  She reported that while she never had concerns about her son's peer group, she did become concerned as he became involved with the group that he traveled to Washington win in January 2020.

Although she described her as "an immature 20," Ms. Kemner indicated she did not consider him to be any less mature than many of his same age peers.  She described the examinee as "a good kid" whose current involvement in the legal system was partially attributed to him being "naïve and malleable."  Ms. Kemner considered her son to be particularly stressed by his arrest and resulting involvement in the legal system, and indicated that she was more concerned about his welfare around the time of the evaluation than she had ever been in the past.

Mr. Berry stated he moved out of his mother's and stepfather's home when 18 as a result of frequent arguments he had with them, along with desire to live independently.  At the time of our August 2021 contacts, reported Mr. Berry, he was living with his girlfriend of 4 years and her girlfriend's two younger sisters in a house they rented from his girlfriend's mother.  He described his relationship with his girlfriend as challenged by the presence of her two younger

6

Berry Evaluation

sisters, economic pressures they experienced, emotional problems they both had, and their different problem-solving styles and divergent political and social views. When we met in January of this year Mr. Berry reported that his relationship with his girlfriend had improved to some degree, in part, as a result of her two younger sisters moving out of the residence they shared.

*Educational & Vocational Histories*

Ms. Kemner described her son as "very intelligent" but too often unwilling to put in the work necessary to achieve academically. She noted that he was diagnosed with attention deficit hyperactivity disorder at the age of 7 and was briefly treated with psychostimulant medication before she discontinued it as a result of side effects he experienced along with the absence of improvements in his attention or activity level.

Ms. Kemner reported that her son had never been retained, identified as having a learning disability, or placed in special education classes. Although she reported he had been placed in detention one or twice, Ms. Kemner described her son as a "good kid" who never exhibited any meaningful behavior problems in school, and was never suspended or expelled. Ms. Kemner described the examinee as obtaining As and Bs through grade school, Bs and Cs in middle school, and even poorer grades (Cs, Ds, Fs) in high school, which she primarily attributed to his priorities shifting and resulting failure to apply himself as necessary.

Like his mother, Mr. Berry reported he had never been suspended, expelled, retained, placed in special education classes, or identified as having a learning disability. He stated he graduated from high school in 2019 and earned a special certificate as a result of his enrollment in a culinary arts program. Mr. Berry estimated his high school grade point average to be 2.3 as a result of his failure to apply himself when the course subject matter did not interest him. content.

Mr. Berry reported working in the past that included working at various restaurants and rideshare driver, and he stated that he was working at a supermarket at the time of the evaluation. Mr. Berry also reported a longstanding interest in serving in the military or entering law enforcement, and cried as he discussed how his arrest on the current charges likely precluded these latter two career paths.

7

Berry Evaluation

*Mental Health & Substance Use Histories*

Ms. Kemner reported that her son first displayed emotional problems when he was in the 9th grade, in response to which he was prescribed anti-depressant medication, participated in weekly counseling, and enrolled in an anxiety support group. She described the examinee as experiencing more enduring problems as a result of his relationship with his biological father, and also experiencing "panic attacks" that appeared to diminish in frequency and severity over time.

In contrast, Mr. Berry reported that he was first identified as having problems with depression when enrolled in the 6th grade and became involved in "Christian counseling" for as long as 7 years with little positive effect. He acknowledged contemplating suicide at times during his teenage years and attempting suicide once. Mr. Berry described feelings of depression as "always there" but waxing and waning in severity. He reported he was first prescribed anti-depressant medication when in the 9th grade, which he stopped after a period of time.

When asked about symptoms he was experiencing around the time of the evaluation Mr. Berry identified dysphoria, sleep difficulties, lethargy, lack of motivation, diminished appetite, weight loss, diminished sex drive, lack of self-confidence, and feelings of guilt. Mr. Berry also complained of symptoms of anxiety more recently that included excessive worry, ruminative thinking, and panic episodes that were characterized by increased heartrate, tightness in his chest, difficulty breathing, and numbness in his fingers.

Mr. Berry described himself as have problems with trust and being was reluctant to disclose and get close to others as a result. He also acknowledged problems controlling his anger, and explained that he typically became angry when people acted incompetently, failed to listen to him, did not let him speak, or demonstrated prejudiced attitudes or beliefs. Although he acknowledged sometimes breaking things when angry (e.g., punching holes in walls, smashing things with a baseball bat), Mr. Berry reported he never threatened or injured others.

Mr. Berry stated he first used alcohol when in high school but never drank on a regular basis or experienced any vocational, educational, interpersonal, or legal problems as a result of his use. Mr. Berry reported he first used marijuana in high school and described a pattern of increasing regular use that continued until his arrest on the current charges, since which time he has remained abstinent. A similar account of Mr. Berry's history of substance use was reported by his mother and stepfather, Tim Kemner, who was also interviewed using videoconferencing technology.

8

Berry Evaluation

*Legal History*

Mr. Berry, his mother, and stepfather all reported that his arrest on the current charges constituted his only contact with the criminal justice system.

**DIAGNOSTIC IMPRESSION**

Given the above, the following diagnosis is offered:

- Dysthymic disorder (characterized by chronic symptoms of depression)
- Panic disorder (characterized by short, discrete episodes of increased physiological arousal reflected by symptoms such as difficulty breathing and increased heartrate)
- Possible cannabis use disorder, in sustained remission

**DEFENDANT'S INVOLVEMENT IN THE OFFENSES**

A Statement of Offense prepared by the Assistant US Attorney Jeffrey Nestler indicated that, after traveling to the nation's capital, Mr. Berry and a number of co-conspirators attended a demonstration by the White House on January 6th, after which they unlawfully entered the US Capitol with the intent of "...trying to obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, specifically, Congress's certification of the Electoral College vote...". It was further indicated that, by doing this, Mr. Berry intended to and was successful in stopping or delaying the Congressional proceeding by intimidating and coercing government personnel.

Referring to himself as a "Libertarian," Mr. Berry reported it was September 2019 when he first investigated and became involved with a local chapter of the "Oathkeepers," which he described as a "Constitutionalist[1] group." He explained he contacted this organization in response to civil unrest and "anti-White" rhetoric he feared could spread to his locale and that, after undergoing some vetting/investigation by the group, he took on responsibilities that included "gathering intelligence" on "radical groups" (e.g., Black Lives Matter) that might be working against "the government and society," and identifying parts of the "critical

---

[1] Mr. Berry described Oathkeepers as a group of people who believed that the Constitution was to be interpreted and applied as written, government should be limited in its ability to regulate and restrict citizens' rights, and which would ultimately "defend people and property" from those who harbored ill intentions.

Berry Evaluation

infrastructure" that might be vulnerable to sabotage.[2] Mr. Berry reported he was subsequently invited to serve on a "security detail" at an event at a St. Petersburg bar at which Roger Stone made a brief appearance, after which there was some discussion of traveling to the nation's capital to serve as security personnel for some US senators who were going to "testify against" the results of the 2019 presidential election, which he had believed was invalid. Mr. Berry, in retrospect, described his travel to Washington as motivated by his misguided desire to support President Trump and protest what he considered at the time to be the "rigged" 2019 election.

Mr. Berry explained that he traveled to Washington by car with approximately 17 other Oathkeepers with the understanding that they would serve as a security detail for the January 6th demonstration. He indicated that while others had weapons they described as being for self-protection, he did not, although he did wear a ballistic vest during the events in question. Mr. Berry explained that, after President Trump addressed the crowd on January 6th, he and some others walked to and entered the Capitol where he heard some discussion of stopping the vote count. Mr. Berry explained that he did not assault or threaten anyone while at the Capitol, and he was very disturbed by threats towards and assaults of law enforcement officers he witnessed. He stated that he returned to his hotel later that day feeling disillusioned with what had happened, and he expressed his concern and upset in a phone call to his mother later that night. Mr. Berry explained that, the following day, he made some effort to clear his phone of what he thought might be incriminating information, after which he returned to Florida with some fellow Oathkeepers.

Mr. Berry indicted that, after returning to Florida, he began to distance himself from the Oathkeepers, and he eventually resigned as a result of feeling "used and betrayed." He stated his belief that the FBI learned of his presence in the Capitol and contacted him as a result of being identified by someone affiliated with the Oathkeepers.

Provided for review was a letter of apology Mr. Berry wrote to a number of US Capitol police officers. In this letter Mr. Berry indicated that, although he joined the Oathkeepers because he initially considered them to be a positive, pro-law enforcement organization made up of law enforcement officers and military veterans, he came to learn that he was misguided in these beliefs. In this letter, Mr. Berry apologized for his actions and wrote that he was sorry for and ashamed of his involvement in the events of January 6th, terrified by the events he witnessed, and regretted his involvement with the Oathkeepers-from which he had immediately resigned after returning to Florida.

---

[2] Mr. Berry stressed that, despite his concerns about some activities of the Black Lives Matter movement, he held no racial prejudice.

Berry Evaluation

As we reviewed the Statement of Offense, Mr. Berry acknowledged all that was included. He again expressed regret and remorse for his actions, and repeatedly stated "This was not what I signed up for" as he discussed his disillusionment with the Oathkeepers and distress about what he witnessed on January 6th. Mr. Berry also indicated that he had fully cooperated with law enforcement officials who were investigating the events of January 6th and had some concerns for his safety as a result.

Ms. Kemner described her son as patriotic and an advocate for the military and law enforcement since his childhood. She stated that it was only more recently that he adopted some of the beliefs that led him to Washington in January 2020. Mr. Kemner offered his perspective that the examinee's affiliation with the Oathkeepers provided him with some feeling of social acceptance, while his involvement with them around their supposed security functions satisfied some of his interests in the military and law enforcement. Both Mr. and Ms. Kemner reported they became concerned when the examinee indicated he would be traveling to the nation's capital, and they described him as naïve with respect to the Oathkeepers and their intentions, and being taken in by them. Ms. Kemner reported that she felt some sense of relief when, the evening after the insurrection, her son was quite upset when he called her from his hotel room and voiced his concerns and regret about what had unfolded that day.

At the time of the evaluation, reported Mr. Berry, he was unsure of where he stood politically and he indicated he no longer held some of the beliefs he had about the outcome of the 2019 election. Ms. Kemner became upset as she expressed concerns that her son's arrest had possibly reinforced some of what she considered to be his troubling beliefs and perspectives. In contrast, Mr. Kemner offer his perspective that the defendant's arrest had served as a "wake up call."

**SUMMARY & OPINIONS**

Caleb Berry was referred for evaluation by his attorney, Daniel Fernandez, who explained that his client had pleaded guilty to federal charges of conspiracy and obstruction of congress as a result of his participation in the January 6, 2020 protest at the US Capitol. Mr. Fernandez requested that I conduct a psychological evaluation of Mr. Berry focused on his background and current psychological functioning as it might go towards better understanding his participation in this event. I evaluated Mr. Berry in my North Tampa office over the course of three sessions that took place in August 2021 and January 2022.

11

Berry Evaluation

Prior to January 2020, Caleb Berry had no contact with the criminal justice system, and he has had no involvement since. His participation in the events of January 6th is the result of a combination of factors including his failure to take advantage of his potential and desire to see himself as doing something meaningful with his life; his misguided belief that his involvement with the Oathkeepers, a group with which he had been affiliated for only a few months, would provide him an opportunity to achieve and do important things; his naivete; his unmet needs for affiliation; and his longstanding interest in law enforcement and the military.

Caleb Berry was 18-years-old on January 6, 2020.[3] Mr. Berry has not achieved to his potential, likely in part as the result of his history of problems with depression and anxiety. At the time of his arrest, Mr. Berry worked at a supermarket, and he had been employed as a contract driver for a car service previous to that. Mr. Berry recognized and continues to recognize that he has not achieved to his potential, and he was and continues to be dissatisfied with his life circumstances.

Mr. Berry became concerned about social unrest that was occurring around the United States in 2019, and developed the misguided belief that such unrest represented a risk to the general welfare of the country generally, and the Tampa Bay area, specifically. When looking for ways he could response, Mr. Berry made contact with the Oathkeepers, which he understood to be a group largely consisting of people who worked or had worked in two professions to which he aspired-the military and law enforcement. Mr. Berry came to believe that members of this group were willing to "defend people and property" in this country from those who harbored ill intentions, and he became involved with them as a result. Being a member of this group served a number of functions for Mr. Berry. It met Mr. Berry's unmet needs for affiliation, which resulted from his failure to have developed a group of friends or others with whom he identified, and it allowed him to (naively) believe he was doing something of importance and serving a greater purpose. Examples of Mr. Berry's naivete around these matters are his report that he served an important function by identifying for the Oathkeepers bay area "critical infrastructure" that was vulnerable to attack, his excitement about working with other

---

[3] For many people, some advanced cognitive functions are not fully developed until they are in their early 20s. Parts of the brain responsible for things like planning, reflecting and deliberating, controlling one's emotions, and taking others' perspectives continue to develop well after the age of 18 ("legal adulthood"). Of course, this does not mean that, at and around the time of the offenses, Mr. Berry did not know what he was doing or did not know that what he was doing was wrong/illegal.

12

Berry Evaluation

Oathkeepers to provide "security" for Roger Stone when he spoke at a St. Petersburg bar, and his belief that he and other Oathkeepers were traveling to the nation's capital in order to provide security for members of congress who were scheduled to address the public. Affiliating with the Oathkeepers and providing security at events also Mr. Berry's needs for affiliation and gave him some feeling of purpose and achievement around matters that were important to him.

Once he saw the outcome of the events in which he participated, reflected on what he had done, and learned more about the Oathkeepers, Mr. Berry realized the error of his ways. He has subsequently made a number of efforts to remedy and take responsibility for the mistakes he has made, and he continues to do so.

Thank you for this evaluation opportunity. Please contact me with any questions about this report or the evaluations it summarizes.

Randy K. Otto, Ph.D.
Licensed Psychologist

Board Certified in Clinical Psychology
Board Certified in Forensic Psychology
American Board of Professional Psychology

**Report Appendix**

**Brief Summary of Background and Qualifications of Randy K. Otto, PhD, ABPP (also see CV)**

I have earned bachelor's, master's, and doctoral degrees in psychology, I completed a clinical psychology internship at the Medical University of South Carolina, and I completed a postdoctoral fellowship in the Law/Psychology program at the University of Nebraska College of Law and Department of Psychology, for which I was awarded a master's degree in legal studies.

I am an Associate Professor in the Department of Mental Health Law & Policy at the University of South Florida, and I also have adjunct appointments in the Departments of Psychology and Criminology there. I have authored or edited five books addressing forensic psychology practice.

I am licensed to practice psychology in Florida & Hawaii, and I am board certified in clinical psychology and forensic psychology by the American Board of Professional Psychology. By way of my private practice, I have conducted forensic psychological evaluations for a little over 30 years. The majority of these evaluations have been of criminal defendants regarding matters of competence, mental state at the time of the alleged offense (criminal responsibility), and sentencing. I have offered expert testimony about these evaluations in both federal and state courts.

Over the past 32 years I have regularly offered training to mental health professionals and attorneys, much of which has been focused on forensic psychological evaluations. This training has been delivered throughout the United States, and some has been offered at the request of state mental health program offices (i.e., Colorado, Florida, Georgia, New Mexico, Ohio, Tennessee, and Utah).

14

# Tab 2
# (Ton Evaluation)



# EVOLVE BEHAVIORAL MEDICINE

Phone 813-384-8521 | Fax (813) 678-27678 | info@evolvebehavioralmedicine.com

**DATE:** Aug 8, 2024 at 4:17:26 PM EDT
**REGARDING:** Caleb Berry
**SUBJECT:** Treatment Summery
**TO:** Whom It May Concern

**Summary:**

Since December 5th, 2022, Caleb Berry (DOB: 05/09/2001) has been under my care for the treatment of diagnoses categorized in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR)." The treatment plan has included a combination of psychotherapy and pharmacotherapy, with regular monitoring and adjustments based on the patient's progress and symptomatology.

Over the course of treatment, Caleb has demonstrated substantial emotional and psychological growth. He has developed greater emotional resilience, improved coping mechanisms, and a deeper understanding of his mental health. This progress has positively impacted his ability to navigate daily challenges and has enhanced his overall quality of life.

**Diagnoses**

- Post-traumatic stress disorder, chronic [ F43.12 ]
- Recurrent major depressive episodes, moderate [ F33.1 ]
- Generalized anxiety disorder [ F41.1 ]
- Panic disorder [ F41.0 ]

**Prescriptions**

- Vistaril 25 mg oral capsule - 1 capsule 3 times a day as needed for acute anxiety, oral route
- Propranolol 40 mg oral tablet - 1 tablet 2 times a day as needed for panic attacks, oral route
- Prazosin 1 mg oral capsule -1-4 capsule(s) once a day at bedtime, oral route, as need for nightmares or insomnia; do not mix with clonidine
- Fluoxetine 50 mg (40 + 10) oral capsule - 1 capsule(s) once a day in the morning, oral route for mood and anxiety

**Dr. Ton | Evolve Behavioral Medicine LLC**
Address | 16614 N Dale Mabry Hwy, Tampa, FL 33618
Phone/Text | 813-384-8521
Fax: 813-678-2768
Email | info@evolvebehavioralmedicine.com
Website | https://evolvebehavioralmedicine.com/

**Progress:**

- PTSD: The patient has shown significant improvement in managing trauma-related symptoms. Flashbacks, nightmares, and hyperarousal have decreased in frequency and intensity.
- MDD: There has been a notable reduction in depressive symptoms. The patient reports increased motivation, better mood stability, and an overall improvement in daily functioning.
- GAD: Anxiety levels have decreased considerably. The patient is better able to manage worry and anxiety through coping strategies learned in therapy.
- Panic Disorder: Panic attacks have become less frequent and less severe. The patient has developed effective techniques to manage panic symptoms.

**Current Status:**

As of the most recent evaluation, [Patient's Name] continues to make steady progress. He remains committed to his treatment plan and is actively engaged in therapy. His symptoms are well-managed, and he exhibits a strong capacity for self-reflection and emotional regulation.

**Conclusion:**

Caleb Berry has shown commendable progress in his treatment for PTSD, MDD, GAD, and Panic Disorder. His journey reflects a strong commitment to his mental health and personal growth.

Please feel free to contact me for any further information or clarification regarding Caleb's treatment and progress.

Sincerely,

**Dr. Cuong Ton**
**Lic# 0S15249**
**NPI# 1508259730**
**DEA# FT7469794**

- 2 -

# Tab 3
# (Berry Letter of Apology)

**Personal and Confidential**

Capitol Police Officers Harry Dunn, Sgt. Aquilino Gonell and Metropolitan Police Officers Daniel Hodges, and Michael Fanone:

My name is Caleb Berry. I am 20 years old. I live in Tampa, Florida with my parents. I graduated High School in 2018. My goal was to become a police officer or possibly to join the military. I have never been in legal trouble until now.

In 2019 I learned about a group called the oath keepers online. I saw that many members were current or former Law Enforcement or Military Veterans. I thought they were a positive organization with pro-law enforcement views. I know now that I was wrong.

I saw this firsthand on January 6th, 2021, and in the days proceeding that day. I was there when the crowd stormed the capitol. I was there when the capital building was breached. I saw the anger on the faces of the people. I saw the destruction and the violence and the meanness of the crowd. I saw the capitol police officers frantically trying to protect the capitol, the senators, the congressman and themselves.

At one point, one of the officers was down and clearly in grave danger. I did try to protect him by standing in front of him, then getting him out of harms way. I do not know who he was.

What I saw that day in the capitol terrified me. I returned to Tampa the very next day and immediately resigned from the oath keepers. I have since been charged with several crimes regarding my conduct on January 6th, 2021. I have accepted responsibility for my conduct and have admitted my guilt. I have also agreed to cooperate fully with the people investigating the capital assault. I know that I will go to prison for my part in all of this.

Although the prospect of prison is scary, I am committed to doing what is right and getting on with my life. I am writing this because I watched the testimony you gave before congress. I also heard the despicable voicemail someone left on Officers Fanone's phone during his testimony. I am haunted by the deaths of the Capitol Police Officers by suicide. I grieve for their families.

I sincerely regret what I did on Jan 6th, 2021, I am ashamed of what happened that day. I wanted to apologize to you and to the country. I am sorry for the pain and anguish I have caused to you and your families. You are good guys just trying to do your job to protect us all. God Bless you and I hope you will forgive me. Someday I hope to meet you personally.

I can be reached through my lawyer. His name is Daniel Fernandez. His office phone number is (813) 229-5353. His email is daniel@fhtampalaw.com.

With my Respect

Caleb Berry

# Tab 4
# (Reference Letters)

Dear Honorable Judge Mehta;
I hope this letter finds you in good
health and high spirits. I am writing
to provide a character reference for my
son, Caleb Richard Berry, who is currently
facing legal proceedings before your esteemed
Court. I understand the seriousness of
the charges against him and the impact
they have had on our country.

I write to you as a concerned parent
who deeply loves their child and
recognizes the gravity of the situation.
I want to emphasize that my sons
actions do not define his entire character,
but rather reflect a lapse in judgement
that I believe he deeply regrets. It is my
hope that you will consider his overall
character, his love for his country and
his potential for growth and change.
Throughout his life my son has
demonstrated a strong sense of patriotism
and a genuine desire to contribute positely
to his community and country. He has
always shown respect for authority, and his
involvement in this unfortunate incident
is an aberration rather than a reflection

of his true character. I believe that
with the continued appropriate guidance and
support, he will learn from this experience
and become a responsible and law-abiding
citizen.

As his parent, I have witnessed firsthand
his remorse and willingness to take responsibility
for his actions. He understands the gravity
of the harm caused and is committed to
making ammends. Caleb has sought counseling
and is currently being treated for the
psychological harm this has caused him.

Furthermore, I would like to highlight
Caleb's positive qualities and achievements.
He has consistently demonstrated integrity,
compassion, and a strong work ethic. I
believe that these qualities, along with
his genuine love for his country, make
him a valuable asset to society.

I, Erica Kemner (maiden name Berry),
Caleb Berry's mother, humbly ask
the courts leniency and consider giving
Caleb an opportunity to rebuild his
life. I am committed to providing ongoing
support and guidance to ensure that he

remains on the right path. I am confident that with the right resources and the chance to learn from this experience, he can make a positive contribution to society and become a responsible citizen.

Thank you for considering my letter and taking the time to understand my perspective as a concerned parent. I trust in the fairness and wisdom of the court to make the best decision for all parties involved. Should you require any further information or have any questions, please do not hesitate to contact me at (813) 851-9854 or ebk008@aol.com.

Respectfully,
Erica Kemner
Erica Kemner

To Whom This May Concern,

I, Bonnie Amplo, write this letter of reference about Caleb Berry with whom I had the pleasure to know for more than 17 years, in order to clarify and defend his good judgment. During this length of time, Caleb demonstrated numerous qualities as a valuable person in our society. In addition to this, I have observed him being polite, hard-worker and also always willing to help when needed. Caleb is also an enthusiastic, sensible and graceful person. Under this pretext, I think this is a solid testimony of how Caleb is and his mental and moral qualities, and I hope you consider this reference letter when determining the outcome of this case. In case you need any further information, please, do not hesitate to contact me. Best regards,

Signature _____ Date: 2-17-23

Print Name _Bonnie Amplo_ Address _____ City

_____ State _____ Telephone _561-628-8173_ E-Mail

_Bonnie@RDK.com_

February 20,2023

Subject: Character Reference

Caleb Berry

Caleb has been an employee at RDK Truck Sales since April 2022. I am also an employee and when I first met him, he was quiet and focused on the job. I got to know him quickly as I was the receptionist and saw him multiple times during the day. At the time I was heavily pregnant and I knew if there was something I needed help with, I could rely on Caleb. He is very ambitious and caring. I have seen him move through the company with poise. I have also gotten to attend an all-day event with him and got to know him personally. He is very caring when it comes to his family and friends. He thinks about the future often and keeps everyone in mind as he makes plans for the future. He is selfless and kind.

He is respectful to everyone he crosses paths with. He is patient and understanding. He has interacted with my 5-year-old with ASD, and she thoroughly enjoys his attention. He has a good attitude when working with customers and goes out of his way to see that things are taken care of. I have not seenwhere Caleb has let a rough day take away from how he treats others or performs at work.

If you need any further information regarding Caleb's character or require me to verify the information I have provided here, please feel free to call me at 813-956-0879

Thank you,

Rebekah Beckwith

2018 27th St. SE

Ruskin FL 33570

813-956-0879

The Honorable Judge Amit P. Mehta,

I am Caleb Berry's direct supervisor as General Manager at RDK Truck Sales. Over the last two months I have gotten to know Caleb as an employee and a person.

Caleb is an exemplary employee that performs his tasks without fail.  He goes above and beyond what is expected from him. If he has any free time from his direct duties, he does not waste any time and immediately pitches in on other projects and helps other employees complete tasks. If Caleb makes a mistake, he owns up to it and learns from it.   The more I have gotten to know Caleb on a personal level I know he would give anyone the shirt off his back to help them.

Respectfully,

Steve Gonser

205 Switchback Loop Apt.202

Valrico, Fl. 33594

813-861-3248

To whom it may concern,

I have the honor of expressing the delight and charm of Caleb Berry. I have only known him for 7 months now but in that time, I have experienced nothing but kindness, professionalism, and honesty.

Caleb and I work together in a hands-on, fast paced environment at the family business of RDK Truck Sales. During the chaos of responsibilities, he makes time to help others with their tasks. Numerous times he has driven hours' worth to deliver and pick up paperwork for me. On rough days, he remains focused, and determined to finish the job, setting aside any negativity. On good days, he is spreading laughter and helping to serve lunch to fellow employees.

Caleb is an open book. He is not afraid to share his mistakes because he owns up to them and works to fix them. Through his honesty and transparency, I found that he genuinely cares. He cares about his family deeply, looking for their approval and looking out for their wellbeing. I've seen him go the extra mile when his dad seems overwhelmed and tired. I've seen his concern and protection when his sister feels sick. He cares about doing well at work not only because it reflects onto his family but also to be proud of himself and what he's accomplished. He cares about his future and his fiancé and the growth they have ahead of them. He cares about the improvement in himself and how it ripples to those around him.

I feel confident in my judge of character in Caleb Berry and am happy to share it. Thank you for your time and consideration.

Sincerely,

Connie Nicholas

Dear Honorable Judge Amit P. Mehta,

I am writing to you today on behalf of my son, Caleb Berry, who is scheduled to appear before you for sentencing in his court case.

As Caleb's father, I understand the gravity of the charges against him and the impact they have had on the victims and the community. Caleb recognizes the severity of his actions and has taken responsibility for his role in the situation.

I am reaching out to you today to ask for leniency in Caleb's sentencing. Caleb is a very young man who has made a mistake, but he is also a son, a brother, and a member of our community. He is a young man with a bright future ahead of him, and I believe he can learn from his mistakes and make positive contributions to society.

As a family, we have taken steps to support Caleb during this difficult time. We have enrolled him in therapy to address his underlying issues and to help him understand the impact of his actions on others. We have also encouraged him to engage in community service to give back to the community and to learn the value of helping others.

I understand that you have a difficult decision to make, but I ask that you consider the circumstances of Caleb's case and the steps he has taken to take responsibility for his actions. I believe that with the right guidance and support, Caleb can move past this mistake and become a positive member of society.

Thank you for your consideration.

Sincerely,

Timothy Kemner
813-495-0135 Cell
tim@rdk.com

## Character Testimony for Caleb Berry

Dear Judge Amit P. Mehta,

I hope this letter finds you in good health and high spirits. I am writing to offer a character testimony for Caleb Berry, whom I have known all of his life. It is my sincere belief that Caleb is a good young man who, unfortunately, found himself in a challenging situation due to the influence of the wrong people.

During my time knowing Caleb, I have observed him to be a kind, respectful, and responsible individual. He has consistently shown compassion towards others and has demonstrated a strong commitment to his family and friends.

Unfortunately, circumstances led Caleb to associate with a group of individuals who engaged in questionable behavior. While I do not condone his involvement in any wrongdoing, I firmly believe that he was misled by those around him and influenced by peer pressure, leading him astray from his true character.

I want to emphasize that Caleb has acknowledged his mistakes and shown genuine remorse for his actions. He is committed to turning his life around and learning from this experience to become a better person. As his uncle, I am confident that with the proper guidance and support, Caleb can reintegrate into society as a productive and law-abiding citizen.

I understand the seriousness of the situation and the importance of accountability, and I firmly believe that Caleb deserves a chance at rehabilitation rather than solely being defined by this unfortunate incident. I kindly request the court's leniency and consideration for Caleb, taking into account his otherwise commendable character and potential for positive change.

Thank you for your time and attention to this matter. Should you require any further information or wish to discuss this matter in more detail, please do not hesitate to contact me.

Sincerely,

Eric M. Kemner

Ralph

Date: February 17 2023

To Whom This May Concern,

My name is Ralph and proud to offer my recommendation of Caleb Barry to whom I have personally known for 22 years as my nephew.

During my relationship with Caleb Barry I have experienced an individual who shows up earlier than asked, works hard, and carries themselves in a polite, respectable manner. In addition, Caleb Barry is a family-person who has always presented themselves with levelheadedness and grace.

It's with great confidence that I recommend Caleb Barry as someone who, I truly believe, possesses the character and judgment for the betterment of our community.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

**Signature** _Ralph Kemene_ Date: 2/17/23
Ralph

February 22, 2023

To Whom It May Concern:

I had the pleasure of meeting Caleb Berry about a year ago at RDK, where we currently work. He is professional, kind, and is always willing to go above and beyond. He strives to be the best at any and every task he is assigned. For example, he tries to work in multiple positions and cross train to be able to assist the different departments and employees and he is always utilizing his time.

RDK is a family-owned business that has various connections of relatives and friendships. Some days there's dogs, kids, or grandkids that make the environment fun to balance out a dull office routine. Caleb is the first to help care for the children and pets. He sets his cousin up in his office watching videos on his computer, buying him snacks from the vending machine, and getting him comfortable when he falls asleep for a nap.

Even on his toughest days he still manages to smile and keep pushing forward. He is extremely mature and intelligent. He genuinely cares about everyone and has a heart of gold. Overall, he is a well-rounded young man.

I feel very confident in my judgement of character in Caleb Berry and am happy to share it.

Sincerely,

Amelia Castaño