UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| v. | Case No. 21-cr-460-APM |
| **CALEB BERRY,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM, AND
### MOTION FOR DOWNWARD DEPARTURE FOR SUBSTANTIAL ASSISTANCE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Caleb Berry to three years of supervised probation, with the special condition that Berry pay $2,000 in restitution and the mandatory $200 special assessment. Such a sentence would be sufficient to reflect the seriousness of this offense while also accounting for Berry's fulsome acceptance of responsibility and the extensive assistance to law enforcement that Berry has provided pursuant to his cooperation plea agreement.

I.   **INTRODUCTION**

On the afternoon of January 6, when it became clear that Congress was going forward with the certification of the 2020 presidential election, Berry marched to the United States Capitol grounds with other members and affiliates of the Oath Keepers. A leader of the group declared that they were going to enter the building to "try to stop the vote count," and Berry fell into the group's "stack" formation, joining members as they wove their way, hands-on-shoulders, up the steps and towards the front of the crowd of rioters outside the Capitol's East Rotunda Doors. There,

1

Berry and the rest of the group joined the mob that assaulted officers with shields, projectiles, and chemical spray, and forced entry into the Capitol around 2:38 p.m. Once inside, Berry and six other members of the group moved towards the House of Representatives side of the building, in search of Speaker of the House Nancy Pelosi, while the other half of the group moved toward the Senate Chamber.

Berry's participation in the attack on the Capitol was not random; it was the culmination of weeks, if not months of increasingly violent calls by Elmer Stewart Rhodes III, the leader of the Oath Keepers, to oppose the lawful transfer of power from Donald Trump to Joseph Biden. Berry was privy to these communications, as a member of the Florida chapter of Oath Keepers. He was aware of the group's discussions about the need to use any means necessary, up to and including the use of force, to stop what they saw as the theft of the election. He understood that the group was bringing a large cache of firearms to D.C. to support these efforts. And he then joined this group in traveling to D.C. and ultimately breaching the Capitol to try to stop the certification proceeding.

At the same time, Berry has fully accepted responsibility for these offenses. Since he was first approached by law enforcement in June 2021, Berry has been cooperative and forthright about his involvement in the attack on the Capitol. One month later, on July 20, 2021, Berry entered his guilty plea before this Court, pursuant to a cooperation plea agreement, to one count of Conspiracy, in violation of 18 U.S.C. § 371, and one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2. Berry agreed to permit the details of his cooperation plea agreement to be made public. Berry then testified before the grand jury, testified at two trials of his co-conspirators, and prepared for and traveled to D.C. to testify at two additional trials where

ultimately his testimony was not needed.

The way that Berry has owned the severity of his conduct and the extent of his mistakes stands in stark contrast to the blame-shifting, responsibility-denying comments made by the more senior leaders of this conspiracy. Through his testimony, Berry has shown this Court very directly how he has learned from and grown in response to his criminal conduct. For these reasons, as laid out in greater detail below, a probationary sentence is appropriate in this case.

## II. THE IMPACT OF *FISCHER*

Since Berry's guilty plea, in *United States v. Fischer*, the Supreme Court held that to prove a violation of 18 U.S.C. § 1512(c)(2) "the Government must establish that the defendant impaired the availability or integrity for use in an official proceeding of records, documents, objects, or as we earlier explained, other things used in the proceeding, or *attempted* to do so." 603 U.S. ----, 144 S. Ct. 2176 (June 28, 2024) (emphasis added). The parties agree that the facts admitted to by Berry in his statement of offense during his guilty plea are sufficient to establish an attempted violation of Section 1512(c)(2). Nonetheless, out of an abundance of caution, the parties have attached here an addendum to the Statement of Offense. The parties would ask that the Court place Berry under Oath at the start of the sentencing hearing to have him adopt the supplemental statement of offense, to make sure he understands the elements of the offense of obstruction of an official proceeding, as clarified by the Supreme Court in *Fischer*, and to have the parties declare on the record their position that there is a sufficient factual basis to support Berry's guilty plea.

## III. FACTUAL BACKGROUND

### A. The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case,

ECF 8, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the 2020 presidential election.

**B.     The Defendant's Role**

Berry's role in the attack on the Capitol, and the conspiracy by certain members and affiliates of the Oath Keepers to forcibly oppose the lawful transfer of power following the 2020 presidential election, is summarized in the stipulated statement of offense filed in this case, ECF 8, and the supplement statement of offense enclosed here. The Court is also fully aware of the details of Berry's conduct, having presided over two trials at which Berry testified and described his role in these offenses.

Berry joined the Oath Keepers in November 2020, after the presidential election, because he "felt that the Constitution was being ignored" and "wanted to do something" about it. *United States v. Roberto Minuta, et al.*, No. 22-cr-15-APM, 01/03/22PM Tr. at 2529.[1] As a member of the Florida chapter of the Oath Keepers, Berry participated in a number of group chats on an encrypted messaging application called "Signal." One such group chat was entitled, "OKFL Hangout." On that "OKFL Hangout" chat, Berry and others discussed the need to take action to oppose what they saw as a fraudulent and stolen election.

For example, on November 25, 2020, Berry wrote to the group, "I'm going to be honest. With the dishonesty in this election, we reach further and further to the brink of no return. I'm fighting for the future of my family and my children, for their children. I'll die for it." Gov. Exh. 5721 (Msg. 1.S.656.5364). Meggs applauded Berry for his passion for the cause, calling him

---

[1] Subsequent references herein to transcripts and trial exhibits are all from the *Minuta* trial, unless otherwise stated.

"Patriot" and saying things like, "Well thank you for stepping up!! That sir makes you a badass!" *Id.* (Msg. 1.S.656.5363).

In late December 2020, the group began to focus on January 6, 2021, and the proceeding before Congress that day to certify the election, as a date and occasion for action—with or without the backing of President Trump. On December 23, 2020, Meggs told those on the OKFL Hangout chat: "We need to surround the Capitol all the way around with Patriots screaming so they hear us inside! Scare the hell out of them with about a million surrounding them should do the trick!" Gov. Exh. 9514 (Msg. 1.S.656.9619). He then posted a photograph of Oath Keepers flags and wrote, "These will be flying Jan 6th in front of he Capitol!!" *Id.* (Msg. 1.S.656.9620). The next day, Meggs wrote to the same chat, "We have 10-12 staying there. So it's gonna be a WILD time in DC we gotta get the crowd going during the day. I think we get everyone up good and close to the Capitol bldg so they can here is inside. Then at night well whatever happens happens." *Id.* (Msg. 1.S.656.9990).

On December 25, 2020, Meggs wrote to the group, "Time for a gut check from everyone in this room. If this is our course where do you fit in. This is where we are, we have been invaded. Patriots are going to stand and we have to lead them!" Gov. Exh. 9514 (Msg. 1.S.656.10074). Young responded, "We need MUCH larger numbers PDQ [pretty damn quick]," and expressed his hope that their mission to D.C. would not be a "fool's errand." *Id.* (Msg. 1.S.656.10075, 10095). Rhodes then jumped into the chat to re-assure Young and the other Florida Oath Keepers that it would not be a fool's errand. *Id.* (Msg. 1.S.656. 10096-10097). Rhodes continued, "I think Congress will screw him [President Trump] over," and "[t]he only chance we/he has is if we scare the shit out of them and convince them it will be torches and pitchforks time is they don't do the

5

right thing." *Id.* Accordingly, Rhodes told the Florida Oath Keepers, they would show President Trump that they were willing to help him fight to stay in power, and "if he fails to act, then we will. He needs to understand that we will have no choice." *Id.* (Msg. 1.S.656.10102).

Berry testified that when Rhodes wrote things like, if Trump failed to act, "then we will," he understood this to mean that Oath Keepers would need to be prepared to "fight against the federal government," and when Rhodes wrote words like, "conquer or die," Berry said he took that to mean, "We needed to act or we would die." 01/03/23PM Tr. at 2556-57.

These types of threats prompted Michael Adams, the leader of the Florida chapter of Oath Keepers prior to Meggs, to resign his position. Adams testified he stepped down because he took Rhodes' words as "telling the President of the United States . . . that if he didn't do this, we were." 12/16/22AM Tr. at 1618-19. Adams said he did not want to be part of that plan. *Id.*

Others, including Berry, did want to be part of Rhodes' plan to "scare the shit out of" Congress on January 6. And so, Berry joined his co-conspirators from Florida in making arrangements to carry out this objective. They created new encrypted planning chats on Signal with titles like "DC OP: Jan 6 21" and "OK FL DC OP Jan 6." On these chats, they coordinated plans for lodging and transportation and had extensive conversations about what weapons and gear they would bring, among other details. Gov. Exhs. 9514, 9557. They also held a series of "DC planning" GoToMeetings in the week leading up to January 6. Gov. Exhs. 1525, 1526. Finally, they planned the logistics for the "quick reaction force" ("QRF") that would provide the firepower to support the operation inside D.C. 01/03/23PM Tr. at 2607-14. The co-conspirators' intent in making these plans was clear: as Meggs told one Facebook acquaintance on January 3, "The natives are very restless. Tell your friend this isn't a Rally." *Id.* (Msg. 2000.T.289).

6

Understanding these plans, Berry traveled to D.C. with other members of the Florida Oath Keepers to be part of the Oath Keepers' January 6 operation. 01/03/23PM Tr. at 2601-2614. Berry knew that other members of the group had brought firearms to support the operation, which they dropped off with the QRF team at a hotel in Virginia. Gov. Exh. 1518; 12/19/22PM Tr. at 2048-2063; 01/03/23PM Tr. at 2607-2614. Berry understood that he would have access to and be allowed to use these weapons if needed in furtherance of the operation. 01/03/23PM Tr. at 2561-2562.

On January 6, 2021, Berry accompanied the Oath Keepers to the rally at the Ellipse. 01/03/23PM Tr. at 2614-2617. Towards the end of the rally, Berry marched with at least some of the co-conspirators towards the U.S. Capitol. ECF 8 at ¶12. When they reached the Capitol grounds, the group huddled around Meggs, who told them that they were "going to try to stop the vote count." 01/03/23PM Tr. at 2618. Meggs told the group that the certification proceeding unfolding inside the Capitol "was illegitimate, it was unconstitutional, and we had to try and stop it." 01/04/23AM Tr. at 2762. Berry testified that he "was scared," when he heard Meggs say this, but he knew "we could do it as a group." 01/03/23PM Tr. at 2618.

After Meggs' comments, the huddle broke up and, in Berry's words, "We stacked up in a single file line and walked up the stairs." 01/03/23PM Tr. at 2618-2621. According to Berry, others in the crowd moved aside to let the "stack" through, "cheering that it was the Oath Keepers, and if anybody was going to get them in the building, it was us." 01/03/23PM Tr. at 2621. Berry believed the crowd wanted to use the Oath Keepers "like a battering ram," because the group had armor and military members and were experienced. *Id.* At the top of the stairs, Berry and other members of his group joined the crowd in pushing towards the door and ultimately into the

7

building. 01/03/23PM Tr. at 2622-2623.

Phone records introduced at trial showed that at about 2:32 p.m., Meggs engaged in a phone conversation with Rhodes, who was already on the phone with Greene, the operational leader for January 6. Rhodes merged them into a three-way call. Gov. Exhs. 1500.2, 2409.1. Moments later, Meggs led Line One up the east steps of the Capitol to the area outside the East Rotunda doors, where rioters were using their hands, flags, and chemical spray to assault the officers guarding the doors, and violently trying to force entry. Gov. Exhs. 1500.2. For minutes, the crowd—including Berry and his co-conspirators—attempted to break into the Capitol. *Id.* When the doors eventually opened, Meggs motioned for Line One to enter, and they did. *Id.*

Once inside, Berry joined half of the group, led by Meggs, in pushing into the House side of the Capitol in search of Speaker of the House Nancy Pelosi. Gov. Exhs. 1500, 1505, 1506, 9553(Msgs. 7.T.570.9758, 9760-61); 01/05/23AM Tr. at 3119-29. They stopped in the area of the Small House Rotunda, just outside Speaker Pelosi's suite of offices. 01/05/23AM Tr. at 3119-3129.  Members of Speaker Pelosi's staff were still hiding in one of those offices. 01/05/23AM Tr. at 3306-5335. Fortunately, the sign designating the suite as belonging to Speaker Pelosi had already been torn down by other rioters, and the defendants did not enter it. 01/06/23AM Tr. at 3122-3125. On the night of January 6, in response to a friend's message that he "was hoping to see Nancy's head rolling down the front steps," Meggs stated, "We looked forward her." Gov Exh. 9553(Msgs. 7.T.570.9758, 9760-61).

Meanwhile, the other half of the group, led by co-conspirator Jessica Watkins, tried to force their way past riot police to the Senate Chamber. Gov. Exhs. 1500.2, 1505. The government introduced video of Watkins yelling, "Push! Push! Push!" and "Get in there!" and "They can't

8

hold us!" as she and six other co-conspirators joined the mob attempting to push down the hallway towards the Senate Chamber. Gov. Exh. 1505. Only by deploying chemical spray were the officers finally able to repel the rioters and hold their line. Gov. Exhs. 1505; 01/06/23AM Tr. at 3374-3375. Watkins later described her conduct in that hallway: "We were in the thick of it. Stormed the Capitol. Forced our way into the Senate and House. Got tear gassed and muscled the cops back like Spartans." Gov. Exh. 9651 (Msg. 192.T.1521).

Berry testified that his actions on January 6 were directly linked to the implicit agreement he had entered into with Rhodes and other Oath Keeper members and affiliates to stop the lawful transfer of presidential power by any means necessary. Berry told the jury that he took all of Rhodes' messages about fighting the government to be an immediate call to fight the government, and when the group went to the Capitol on January 6, it was to fight the government that day. 01/04/23AM Tr. at 2766.

On January 7, 2021, while heading home from D.C., Berry factory-reset his iPhone, deleting the data on the phone that included encrypted communications with at least some of the co-conspirators. ECF 8 at ¶18. Berry testified that his goal was to "destroy evidence," because he was "afraid" of "federal law enforcement, federal agencies." 01/03/23PM Tr. at 2631-2632.

IV.   THE CHARGES AND PLEA AGREEMENT

On July 20, 2021, Berry waived his right to be indicted and pled guilty to an Information charging him with Conspiracy, in violation of 18 U.S.C. § 371, and one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2.

V.   STATUTORY PENALTIES

As noted by the Presentence Report issued by the U.S. Probation Office, on count one,

Berry faces up to five years of imprisonment, and on count two, he faces up to 20 years of imprisonment. ECF 28 at ¶4. Each charge also carries a term of supervised release of not more than three years, a fine of up to $250,000, restitution, and a mandatory special assessment of $100. *Id.*

## VI.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c) and § 1B1.1, cmt. (background). The Guidelines apply to a "heartland of typical cases." *Koon v. United States*, 518 U.S. 81, 94-95 (1996). A "departure" is based on "the framework set out in the Guidelines," while a "variance" is imposed "outside the guidelines framework" based under the applicable 18 U.S.C. § 3553(a) factors taken as a whole. *United States v. Murray*, 897 F.3d 298, 309 n.8 (D.C. Cir. 2018) (cleaned up).

### A.   The Calculation of the Parties and the Presentence Report

The two counts of conviction are grouped for guideline calculation purposes because they involve the same victim and one or more acts or transactions. U.S.S.G. §3D1.2(b).

At the time of the plea agreement, the parties estimated Berry's total offense level to be 24, resulting in a Guidelines range of 51 to 63 months' imprisonment. However, this estimate was based on the presumption of the applicability of two specific offense characteristics under U.S.S.G. § 2J1.2 having to do with the interference with the administration of justice. Since that time, the D.C. Circuit decided *United States v. Brock*, No. 23-3045, 2024 WL 875795 (D.C. Cir. Mar. 1, 2024), which held that the term "administration of justice," as used in U.S.S.G. § 2J1.2, does not

10

apply to Congress' certification of electoral college votes. *See id.* at *8. Accordingly, the enhancement in U.S.S.G. § 2J1.2(b)(2), which requires a three-level enhancement "[i]f the offense resulted in substantial interference with the administration of justice," does not apply where a defendant interfered solely with the certification of electoral college votes. U.S.S.G. § 2J1.2(b)(2); *Brock*, 2024 WL 875795, at *15. This holding also precludes application of the eight-level enhancement in U.S.S.G. § 2J1.2(b)(1)(B), which applies if an offense "involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice," to defendants who interfered solely with Congress' certification of electoral college votes.

Thus, the following Sentencing Guidelines sections apply:

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2 | Base Offense Level | 14 |
| U.S.S.G. §2J1.2(b)(3)(C) | Extensive Scope, Planning, Preparation | +2 |
| U.S.S.G. §3C1.1 | Obstruction (destroying documents) | +2 |
| U.S.S.G. §3C1.1 | Minor Role | -2 |
| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -3 |
| | Total | 13[2] |

The Presentence Report correctly concluded that the defendant does not meet the criteria at USSG §4C1.1, as he played a role in transporting firearms in furtherance of his offenses of conviction. ECF 28 at ¶102a (citing USSG §4C1.1(a)(7)).

At a level 13, the recommended sentencing range would be 12 to 18 months of incarceration.[3]

---

[2] This calculation differs slightly from that of the Presentence Report, ECF 28 at ¶¶86-103, which does not adopt a minor role adjustment. ECF 28 at ¶158. But the plea agreement included a minor role adjustment, ECF 7 at 4, so the government is including that adjustment here.

[3] In other cases, following the Circuit's decision in *Brock*, the government has asked the Court to depart upward under Section 5K2.7 (Disruption of Governmental Function), and/or

11

### B. Downward Departure for Substantial Assistance

The government moves, pursuant to U.S.S.G. § 5K1.1, for a downward departure for the substantial assistance Berry has provided to law enforcement. The government submits that a seven-level downward departure is appropriate given the level and nature of assistance Berry has provided.

The Guidelines provide that, "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." U.S.S.G. § 5K1.1. In determining the appropriate level of reduction to apply, the Court should consider the following factors:

> (1) the court's evaluation of the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;
>
> (2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;
>
> (3) the nature and extent of the defendant's assistance;
>
> (4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance;
>
> (5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

---

Section 5K2.6 (Weapons). The government is not advocating for such departures here, because the parties agreed under the terms of the plea agreement to not advocate for any upward or downward departures outside of the departure for substantial assistance to law enforcement. ECF 7 at 4.

12

Here, the second and fifth factors clearly apply and can be quickly addressed. Within two weeks of being approached by law enforcement, in June 2021, Berry began cooperating, proffering several times and pleading guilty on July 20, 2021. In other words, Berry's cooperation was extremely timely. U.S.S.G. § 5K1.1(a)(5).

Berry's cooperation has also been truthful, complete, and reliable. Much of the information he provided has been corroborated by other witnesses and objective evidence such as messages, video, photographs, and other data recovered from his phone, from public source information and articles, and from the devices and accounts of others recovered by law enforcement during this investigation. In other words, the second factor listed above also supports a finding of substantial assistance by Berry. U.S.S.G. § 5K1.1(a)(2).

With respect to the significance, usefulness, nature, and extent of Berry's assistance (the first and third factors), Berry is the only cooperating defendant (in these related cases or in any January 6 case) to testify at more than one trial. He testified at the trials of *Minuta, et al.* and *United States v. Sandra Parker, et al.*, 21-cr-28-APM, and he prepared for and traveled to testify at the trials of *United States v. Rhodes*, 22-cr-15-APM (where his testimony was not needed) and *United States v. Brown*, 21-cr-609-APM (which was continued to December 2024).

Berry's testimony was significant. His testimony about the huddle among members of Stack One when they reached the Capitol grounds, in which Meggs told the group that they were going to go inside the Capitol "to stop the vote count," provided direct evidence of the intent of the group as they started marching up the steps of the Capitol. Such evidence was not available from any source other than those present for the huddle. Similarly, Berry provided context and meaning to the scores of messages introduced into evidence from the co-conspirators' Signal chats,

13

which could only be provided by someone who read and participated in these chats in real time. Berry's testimony about his understanding of the group's intent, as they traveled to D.C. for January 6, 2021, and ultimately participated in the attack on the Capitol, was pivotal testimony in both trials at which he testified.

This cooperation was not without risks. Berry was only the third member of this conspiracy to plead guilty, and he did so pursuant to a public cooperation plea agreement, in a case that has garnered significant national interest and, sadly, controversy. Berry then testified against his co-conspirators, identifying several of them in court, over the course of two trials. This took courage on Berry's part. While the government is not aware of any direct threats to Berry or his family, other individuals who cooperated publicly with the government in this investigation have received such threats.

The experience of testifying also took a significant toll on Berry's emotional and physical health. Berry was 19 at the time he breached the Capitol; he was 21 at the time he testified. He showed impressive maturity and calm on the stand, so the Court may not realize the strain Berry was under. He literally soaked his clothing with sweat during his testimony, and he was physically sick after he finished with his sixth cross-examination during the *Parker* trial. This Court should give Berry credit for the danger and risk of injury to himself and to his family, and the actual harm to his mental health, that resulted from his cooperation in this case. U.S.S.G. § 5K1.1(a)(4).

Taking all of these factors into account, a seven-level downward departure would reduce Berry's adjusted offense level by about 54 percent from the government's estimated final adjusted offense level of 13, which he would have faced absent his cooperation in this matter. The

government submits that such a reduction appropriately reflects the principles outlined above that this Court should consider in assessing the level of assistance Berry provided to law enforcement.[4]

### C. Sentencing Guidelines Recommendation

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. ECF 28 at ¶ 106. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at level 6, the defendant's Guidelines range is 0 to 6 months' imprisonment. Because level 6 is in Zone A of the Guidelines, the Court may impose a probationary sentence. U.S.S.G. §§ 5B1.1(a)(1), 5C1.1(b). In other words, a sentence of three years of probation, with a requirement of restitution, among other conditions, would be a Guidelines-compliant sentence at level 6.

## VII. SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the government's recommended sentence.

### A. Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Berry's conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. Perhaps even more alarmingly, these actions were not spontaneous for Berry and his co-conspirators—they were in furtherance of a conspiracy hatched weeks earlier to take

---

[4] If the Court were to adopt the Presentence Report's final adjusted offense level of 15, the government would still request a seven-level departure and the same allocution contained herein, as a sentence of three years of probation would still be a Guidelines-compliant sentence at level 8, as it is at level 6, and it would still be an appropriate sentence under the factors outlined in 18 U.S.C. § 3553(a).

any means necessary, up to and including the use of force, to stop the lawful transfer of power from Donald Trump to Joseph Biden by obstructing Congress' certification of the Electoral College vote. Berry came to D.C. understanding the potential for, and in many ways hoping to participate in, a forcible interruption of the certification of the election. He wanted to fight and knew his group had brought weapons to support the effort. And Berry ultimately joined the violent mob that breached the Capitol in furtherance of this conspiracy. The nature and circumstances of Berry's offense were of the utmost seriousness, and fully support the government's recommended sentence.

B.  **The History and Characteristics of the Defendant**

At the time of this offense, Berry was gainfully employed. He had no criminal history. In other words, the defendant's crimes on January 6 were an isolated incident in an otherwise law-abiding life.

C.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a significant period of probation, with conditions such as restitution and community service, as part of the defendant's sentence. Berry's criminal conduct on January 6 was the epitome of disrespect for the law.

D.  **The Need for the Sentence to Afford Adequate Deterrence**

Because of the unique circumstances of this case, a probationary sentence is appropriate "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the

16

Capitol certainly was.[5] At the same time, early and public acceptance of responsibility, coupled with his cooperation with law enforcement, is something that should be rewarded, to encourage others to take similar responsibility for their conduct on January 6. For these reasons, a lengthy probationary sentence achieves the goal of general deterrence.

### E. The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. The government is recommending a Guidelines-compliant sentence, should the Court apply the government's recommended departure for substantial assistance to law enforcement.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). The government's recommended sentence does not create unwarranted disparities in consideration of the substantial assistance he has provided to law enforcement, the toll it has taken on him, and his complete and public acceptance of responsibility for his conduct.[6]

## VIII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction,

---

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Here, the parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Berry must pay $2,000 in restitution.[8] ECF 29 at 9. As the Presentence Report reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. ECF 28 at ¶8, n.3. For the reasons outlined in greater detail in the restitution brief submitted in the related *Rhodes* matter, *see* Case No. 22-cr-15, ECF No. 654, which the government incorporates by reference, the government submits that $2,000 represents an appropriate and proportional amount of restitution for Defendant Berry to pay.

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## IX. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of three years of probation, with the special conditions that the defendant pay $2,000 in restitution and the mandatory $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY: _____
Kathryn L. Rakoczy
D.C. Bar No. 994-559
Assistant U.S. Attorney
U.S. Attorney's Office for the District of Columbia
601 D Street, N.W., Room 5.236
(202) 252-6928
Kathryn.Rakoczy@usdoj.gov